NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

MALCOLM KONNER CHEVROLET,
INC., Konner Chevrolet, Inc. and Amalgamated Local Union 355, Respondents.

No. 14804.

United States Court of Appeals
Third Circuit.

Argued Oct. 23, 1964.

Decided Dec. 4, 1964.

Robert G. Sewell, National Labor Relations Board, Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Atty., National Labor Relations Board, on the brief), for petitioner.

Alexander Eltman, Garden City, N. Y. (Joseph T. King, New York City, on the brief), for respondent.

Before McLAUGHLIN, KALODNER and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

In May 1962 Malcolm Konner and his wife were the sole stockholders of a family corporation, Malcolm Konner Chevrolet, Inc., which operated a Chevrolet

agency in Caldwell, New Jersey. Konner was president and general manager. The employees consisted of approximately nineteen shop and service people and salesmen. There is no contradiction of the testimony of Charles W. McMickle, employed by the concern as a body and fender mechanic, that in May 1962, Joseph Medwin, whom the Hearer found to be a supervisor for Chevrolet, Inc. and whom Gibson, another mechanic employee, described as the "General Manager of the place" asked the employees if they wanted a union in the shop. He said further, if they did desire it he knew somebody with the union and "we could have him drop around." A day or so later Medwin said to McMickle that if each employee signed a card he could bring the union people over. Medwin told McMickle that the cards don't mean anything unless you want the union in. The employees signed the cards. Shortly after that Medwin talked with Gibson who said Medwin asked him and another employee to sign three cards that "we were going to be unionized"; that a union representative was coming shortly to talk with the men; that whether they had the union depended on the men. Gibson testified that while in Medwin's office he saw other employees come in to sign cards; that Medwin told them also that if it was going to be a unionized shop, to sign these three cards; that "If we wanted the union, we could have it; if not, we didn't have to be bothered with it." Other than the signing of the cards there was no vote by the employees on the acceptance of Local 355 as their union. The question of voting on a collective bargaining contract was then brought up by Gibson with Stirt the union representative. On two occasions at least Stirt refused to have a vote as to this. Gibson told him what the men wished to have in the contract. According to Gibson Stirt replied " * * * that they were pulling my leg, he didn't want to be bothered, and if I continued, I would get myself into trouble. Not stating how he meant." A contract was executed on June 1, 1962 between Malcolm Konner

Chevrolet, Inc. and the union. Stirt gave Gibson a copy of the contract the next day. Gibson repeated his request for an employees' vote on the contract and Stirt said he "could not do it." Gibson told Stirt "all he was selling us was insurance and it wasn't worth it to have a union for it." On June 6th Gibson asked Stirt by telephone for an employees' vote on the contract and two days later personally reiterated this request. The Hearer found that "Stirt then called Gibson aside, again warned him that he would get into trouble" if he continued this "and repeated his previous request that Gibson 'work with' him." Gibson filed charges with the Board on June 19, 1962 and on that day circulated a petition among his fellow employees which called for a termination of membership in Local 355 on the grounds of misrepresentation. Ten of the employees signed that petition. The next day Gibson was laid off with the reason given that the work was slow. Within a short time thereafter Medwin asked four employees, Messrs. Lyckowski, Grapes, Bowden and Richmond, if they had signed the petition. During the same period Malcolm Konner also asked employee Lyckowski if he had signed the petition and told him that Gibson had fifteen names on the petition. Mitchell Konner, brother of Malcolm, asked employee Richmond the same question.

The Hearer found and the Board affirmed that Gibson had been discharged for being the instigator and prime mover of a movement to obtain a vote on the employment contract and in the preparation and circulation of the petition to repudiate the union as the bargaining agent of the employees of Konner Chevrolet, Inc. There was a further finding upon the entire record and upheld by the Board that the union caused the employer to discharge Gibson and that the reason given for the discharge, slow work, was a pretext to conceal the fact that he was actually discharged for his protected activity.

The Board also affirmed the findings of the Hearer that the solicitation

974

of employees to join the union by Supervisor Medwin was coercive, which element was not eliminated by the Supervisor's statements that the employees were not required to have a union. The Hearer's conclusion that this was unlawful assistance to the union was upheld by the Board.

■ The Hearer found and the Board affirmed that Malcolm Konner Chevrolet, Inc. and Local 355 executed a collective-bargaining contract on June 1, 1962 covering all the shopworkers and salesmen and containing a union-shop clause; that despite testimony by Malcolm Konner that he had destroyed that contract on June 4, 1964 because Malcolm Konner Chevrolet, Inc. on that date ceased operations, such contract continued in existence, and that Malcolm Konner Chevrolet Corp., as the successor to Malcolm Konner Chevrolet, Inc., became a party thereto.

■ We are satisfied that there is ample evidence on the whole case to thoroughly support all of the above findings. The successor relationship of Malcolm Konner Chevrolet Corp. is solidly founded upon the testimony of Malcolm Konner himself. He was president, general manager and with his wife, the owner of Konner Chevrolet, Inc. He is president, general manager and with his wife, owner of the new corporation which is exactly the same sort of business operation as the first one, merely at a different address and with a slight alteration in the corporate title. Under the facts the Board is well within the governing case law in concluding that the second corporation is no more than the practical continuation of the first. N. L. R. B. v. Herman Brothers Pet Supply, Inc., et als., 325 F.2d 68 (6 Cir. 1963); N. L. R. B. v. Tempest Shirt Mfg. Co., Inc., 285 F.2d 1 (5 Cir. 1960); N. L. R. B. v. Ozark Hardwood Co., 282 F.2d 1, 5–7 (8 Cir. 1960). There is no need in fact or law for a separate proceeding against the successor corporation.

■ The argument made on behalf of the respondent employees that the Board is barred by laches from enforcement of its order is completely without merit. Any appreciable delay here was occasioned by the attempt to work out a satisfactory settlement. Meanwhile all or any of the respondents could have affirmatively brought on review proceedings if that had been desired. The negotiations for settlement did result in payment to Gibson of his back pay and waiver by him of his right to reinstatement.

With the exception of the two items respecting Gibson, the Board's order will be enforced in full. A decree to that effect may be submitted.